[No. 21616-7-II.   Division Two.   August 7, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. GARY WILLIAM ROSS, *Appellant*.

*David W. Murdach*, for appellant.

*John W. Ladenburg, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

HUNT, J. — Gary Ross appeals his conviction of unlawful manufacture of a controlled substance and possession of a controlled substance, RCW 69.50.401. Plainclothed depu-

ties entered Ross's property after dark to look for evidence of a marijuana grow operation. After detecting the smell of growing marijuana from the detached garage, the deputies obtained a search warrant, which led to seizure of growing marijuana plants and cut and packaged marijuana. On appeal, Ross argues that the trial court should have granted his motion to suppress because the deputies' initial intrusion onto his property to gather evidence establishing probable cause for the search warrant was unreasonable. We agree and reverse.

## FACTS

In February 1995, Pierce County Deputy Sheriff Frank Brown told fellow Deputy Sheriff John Bananola that he had received information from an anonymous informant about a possible marijuana grow operation and that he had followed the informant's directions to a residence at 8310 Woodbourne Road Southwest in Tacoma. A few days later, Bananola followed these directions to the same address. He saw a blue Chevy Blazer in the driveway and determined it was registered to Gary Ross.

Ross's residence abuts two parallel streets running north and south: Luzader, to the west, and Woodbourne, curving east at the southeast corner in front of Ross's house. There are two entrances to the property. On Woodbourne, a front gate opens to a long concrete path leading to Ross's front door; this entrance is not well lit or maintained, and one number is missing from the street address on the gate. A large, semi-circular gravel driveway connects the property to Luzader and leads to a detached garage and to a gate and path beyond to the front door. A light on the garage illuminates the driveway such that the garage is clearly visible from the street at all times. A fence abuts the south and east sides of the driveway, separating it from the front yard.

At approximately 8:30 at night on March 24, 1995, Bananola and Deputy Sheriff Jeff Reigle went to Ross's resi-

dence. Wearing plain clothes with no visible signs of their identities, they parked their unmarked police vehicle on Luzader and walked up the driveway towards the garage, located approximately 25 to 40 yards back from Luzader. At the southeast corner of the garage, Reigle detected the smell of growing marijuana emanating from the garage. Bananola could not smell it, but noticed mold and mildew on the garage window.

Wanting to double-check the marijuana odor before filing an affidavit for a search warrant, the deputies returned to Ross's residence later that evening, at approximately 12:10 in the morning of March 25. They approached the garage in the same manner as before. This time, both deputies smelled growing marijuana. Neither deputy approached the front door nor attempted to contact Ross and identify themselves.

Bananola filed an affidavit of probable cause and obtained a search warrant to seize any evidence of a grow operation and drug trafficking in Ross's garage, house, and vehicle. Deputies executed the warrant on March 31. They found growing marijuana plants in the garage and house and packaged cut marijuana in the house.

Following Bananola's death in October 1995, Ross moved to dismiss the charges against him, arguing that an inability to cross-examine the search warrant affiant would prejudice his right to a fair trial. The trial court denied the motion.

Ross then moved to suppress the evidence, arguing that the search warrant was invalid because: (1) the deputies were not lawfully on his property when they obtained probable cause, thus invalidating the warrant; (2) there was no probable cause to search the house and vehicle; and (3) the warrant was too general in listing the items to be seized. The trial court ruled that Ross did not have a legitimate expectation of privacy in the driveway area and that the police acted within the scope of an implied invitation while conducting legitimate business thus, it denied the motion.

After a trial on stipulated facts, the trial court found

Ross guilty of unlawful manufacture of a controlled substance and unlawful possession of marijuana in excess of 40 grams. RCW 69.50.401.

On appeal Ross challenges: (1) the trial court's rulings on the initial search, the search warrant, and denial of his motions to disclose the identity of the informant and to dismiss; (2) the trial court's denial of his motions to merge the two counts, to dismiss based on double jeopardy, and to treat the two counts as the same criminal conduct for sentencing purposes; and (3) imposition of a $10,000 fine.

## ANALYSIS
### A. Initial Search To Obtain Probable Cause for a Search Warrant

■ The Fourth Amendment to the United States Constitution guarantees: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause . . . ." Fourth Amendment protection of a citizen's house extends to its curtilage. *See State v. Niedergang*, 43 Wn. App. 656, 659, 719 P.2d 576 (1986). But "[p]olice officers on legitimate business may enter an area of curtilage which is impliedly open to the public, such as an access route to a house or a walkway leading to a residence." *State v. Chaussee*, 72 Wn. App. 704, 708, 866 P.2d 643 (1994) (citing *State v. Seagull*, 95 Wn.2d 898, 902, 632 P.2d 44 (1981); *State v. Ferro*, 64 Wn. App. 181, 183, 824 P.2d 500 (1992)).

■ Whether an officer is lawfully within a curtilage depends on whether he or she remains within the scope of an implied invitation to be there.

> It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. An officer is permitted the same license to intrude as a reasonably respectful citizen. However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invita-

tion and intrude upon a constitutionally protected expectation of privacy.

*Seagull*, 95 Wn.2d at 902-03 (citations omitted) (footnote omitted).[1]

■■ Whether an officer remains within the scope of an implied invitation depends upon the facts and circumstances of the particular case. *Seagull*, 95 Wn.2d at 903; *Chaussee*, 72 Wn. App. at 709. Ross does not challenge the trial court's findings that his driveway was impliedly open to the public: It is exposed to the street, is illuminated by a light attached to the garage, and appears to provide a direct access route to his front door. But the inquiry here is not on whether the officers smelled marijuana from a place impliedly open to the public, such as the driveway. Rather, the question is whether their method of viewing or smelling is particularly invasive and exceeds the scope of any implied invitation. *Seagull*, 95 Wn.2d at 902-03.

> In determining whether an officer exceeded the scope of an "open view", one must consider several factors, including whether the officer (1) spied into the house; (2) acted secretly; (3) approached the house in daylight; (4) used the normal, most direct access route to the house; (5) attempted to talk with the resident; (6) created an artificial vantage point; and (7) made the discovery accidentally.

*State v. Graffius*, 74 Wn. App. 23, 27, 871 P.2d 1115 (1994) (citing *Seagull*, 95 Wn.2d at 905).[2]

Considering these factors, the circumstances of the depu-

---

[1]Investigation of criminal activity is considered "legitimate business." *See State v. Rose*, 128 Wn.2d 388, 393, 909 P.2d 280 (1996).

[2]In *Graffius*, the court determined the following conduct did not exceed the scope of an implied invitation and was not an unreasonable intrusion:

> Four uniformed officers arrived at Graffius' home at about 5:30 p.m. while it was light. They were in uniform. They used the driveway commonly used for guests and members of the public who were visiting. They parked the police vehicles in the gravel portion of the driveway by the garage . . . .

> Upon arrival, Detectives Holeman, Jeske and Hawkins knocked loudly on Graffius' front door. There was no response. A fourth officer went to the north side of the house by the back fence. Detectives Holeman, Jeske and Hawkins

ties' intrusion here exceeded the scope of any implied invitation. The discovery here was not accidental; rather the officers entered Ross's property specifically to investigate an informant's tip about a marijuana grow operation. They acted secretly by going on the property at night, in an unmarked car, in plain clothes, and without identifying themselves to Ross. They did not use the most direct access to the front door, from Woodbourne, the locus of Ross's address and front gate. Rather they accessed the driveway and garage from Luzader, abutting the side of the house. According to Ross, to reach the spot where they smelled the marijuana, the officers had to deviate nearly ten feet from a direct route between their patrol car and the gate to the side path to the front door. Moreover, they made no attempt to talk to Ross, but instead clearly tried to avoid him.

We reiterate that "[i]t would be unreasonable to require, in every case, that police officers walk a tightrope while on private property engaging in legitimate police business." *Seagull*, 95 Wn.2d at 905. But in *Seagull*,[3] slight deviation from the most direct access route was the only factor that

---

then walked down a concrete walkway and returned to the graveled parking area on the north side of the garage. Officer Jeske knocked on a side door of the garage. There was no response. Meanwhile, Detective Holeman saw two garbage cans next to the side door to the garage. The lid was ajar on one can, creating an opening 6 to 8 inches wide. Detective Holeman looked in and saw a fist-sized bud of marijuana on top of a few other pieces of household garbage . . . .

Detective Holeman saw the marijuana by natural light; no flashlight was used.

*Graffius*, 74 Wn. App. 24-25.

[3]*Seagull*, 95 Wn.2d at 905:

[T]he officer's route to the north door would have been a normal one to take if he had gone directly to that door from his car in the parking area. The officer was not secretive; rather, he acted openly in an honest attempt to talk with the occupants of the house [by knocking on the front door]. He did not get as close to the greenhouse as he could have; instead he kept his distance. The discovery was accidental in that he did not go to the residence with the purpose of viewing or looking for contraband. He did not create an artificial vantage point from which to advance his observation. Further, all acts occurred during daylight hours. The only act that seems open to challenge is that the officer appears to have strayed slightly from the most absolutely direct route between the two doors.

appeared unreasonable; rather, the remaining circumstances made the discovery of the contraband reasonable. Similarly, nonaccidental discovery of contraband during purposeful investigation of criminal activity after dark does not by itself render a search invalid. *See State v. Rose*, 128 Wn.2d 388, 396-97, 909 P.2d 280 (1996). Once again, in *Rose*, other circumstances of the search made it reasonable, notably that the officers responded to the landlord's request to investigate at 7:00 in the evening and attempted to identify themselves to Rose.[4]

Here Bananola and Reigle came in an unmarked car, entered Ross's property via the side route, after dark, with the intent of discovering evidence of criminal activity, without identifying themselves. Any of these factors, by itself, would not necessarily make the intrusion unreasonable. But the combination of these factors makes this intrusion unreasonable, especially in light of our decision in *State v. Johnson*, 75 Wn. App. 692, 879 P.2d 984 (1994).

In *Johnson*, DEA agents "furtively entered the Johnsons' property under cover of darkness in an apparent effort to look for a marijuana grow operation. Unlike the officers in *Seagull* and [*State v. Vonhof*, 51 Wn. App. 33, 751 P.2d 1221 (1988)], their only purpose was to conduct a search and gain information by trespassing on private property." *Johnson*, 75 Wn. App. at 705. Unlike *Johnson*, however, the officers here did not trespass by entering an area impliedly closed to the public. But as we have already

---

[4]Rose's landlord saw suspicious circumstances and called the police, and Deputy Dekofski responded.

Dekofski drove to the rental property, and parked in the parking area sometime around 7 P.M. [He and the landlord] walked together back to the shed, where Deputy Dekofski could smell marijuana . . . . Dekofski looked in a window at the back of the mobile home using a flashlight, and then walked around to the front of the mobile home and knocked. While on the front porch, he shined his flashlight through a window and saw cut marijuana and a scale on a table inside.

*Rose*, 128 Wn.2d at 390-91. Thus, although Deputy Dekofski came to the property to investigate criminal activity, the nature of the search was not unreasonable, and no more than a "reasonably respectful citizen" would do. Dekofski arrived at a reasonable hour, parked by the mobile home, attempted to contact Rose, and did not hide his identity.

noted, their entry was not by the normal, most direct route to the front door. Similar to *Johnson*, here the officers arrived in an unmarked car, in plain clothes, after midnight, and made no attempt to contact Ross or otherwise notify him of their presence. Taking all these circumstances together, we find that a reasonably respectful citizen would not have approached Ross's home in this manner.[5]

■■ If probable cause for a search warrant is obtained by way of an unconstitutional intrusion, it cannot support the warrant. *See Johnson*, 75 Wn. App. at 709. We hold that the unannounced, plainclothed, after-dark, warrantless, side-entries onto the curtilage of Ross's garage to investigate a marijuana grow were unreasonable under the Fourth Amendment; the search warrant based thereon was invalid; and the evidence seized with the warrant should have been suppressed. We therefore reverse. Because our holding resolves this appeal, we do not address the remaining issues.

MORGAN and SEINFELD, JJ., concur.

Decision adhered to upon reconsideration April 9, 1999.

---

[5]Ross's brief alludes to a Tacoma police department policy against investigations late at night by officers in plain clothes. We cannot find this policy reflected in the record. If such a policy exists, however, it could also bear on the reasonableness of the officers' initial investigatory search.